Filed 07/30/26

| VERMONT SUPERIOR COURT<br>Chittenden Unit<br>175 Main Street<br>Burlington VT 05402<br>802-863-3467<br>www.vermontjudiciary.org |  | CIVIL DIVISION<br>Case No. 24-CV-00999 |

| | |
|---|---|
| GROUNDWORKS COLLABORATIVE, INC., et al.,<br>     Plaintiffs<br><br>v.<br><br>VERMONT AGENCY OF HUMAN SERVICES, et al.,<br>     Defendants | DECISION ON MOTIONS |

## RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs – several homeless advocacy organizations and homeless individuals – bring this action arising from Defendants' (collectively, the "Department for Children and Families," or "DCF") alleged due process violations in connection with the notice provided when emergency housing benefits end. The parties now cross-move for summary judgment on the sole remaining claim (Count III). On June 24, 2026, the Court heard oral argument on the cross motions, and then allowed the parties until July 8, 2026 to submit supplemental memoranda on the issue of mootness in light of recent changes to the governing law and any continued need for relief.[1] For the reasons discussed below, the Department's motion is GRANTED and Plaintiffs' motion is DENIED.

### Procedural Background

In the original Complaint in this action, filed on March 15, 2024, Plaintiffs brought one count seeking relief under Rule 75 of the Vermont Rules of Civil Procedure. This Court denied a motion for a temporary restraining order as to the organizational plaintiffs, but granted one in favor of the intervenor individual plaintiffs, before subsequently denying the preliminary injunction motions as to all plaintiffs. 2024 WL 1344378, at *5 (Mar. 22, 2024) (Toor, J.).

Plaintiffs then amended their complaint on April 19, 2024. The Amended Complaint, which is still the operative complaint in this case, initially asserted claims under Rule 75, the Administrative Procedure Act ("APA"), the Vermont Constitution's due process clause, and the Common Benefits clause. This Court has since granted Defendants' motion for judgment on the pleadings as to the APA, Rule 75, and Common Benefits claims, *see* 2024 WL 5316885, at *2

---

[1] In essence, both Plaintiffs and Defendants assert that this matter is not moot as there continues to be a live dispute, and a decision from this Court would be appropriate and helpful to the parties.

(Dec. 17, 2024) (Hoar, J.); 2025 WL 745679, at *7 (Feb. 26, 2025) (Hoar, J.), leaving only the due process claim "to the extent that the Amended Complaint seems to allege an ongoing due process violation." 2025 WL 745679, at *6. The Court also expressed its "concern[] that this claim might be one that is capable of repetition yet evading review" but that it could "not make that determination on this record." *Id*.

In April 2025, Plaintiffs again sought temporary and preliminary injunctive relief on an emergency basis. The Court issued a temporary restraining order that conditionally certified the plaintiff class and provided that "Defendants shall not deprive any member of the plaintiff class presently receiving General Assistance Emergency Housing benefits of those benefits without due process of law." Temporary Restraining Order ("TRO") at 1 (filed May 1, 2025). The Court defined "due process" to include, at a minimum, "[w]ritten notice that includes the factual and legal basis for the Department's decision to terminate benefits, including at reauthorization"; "[d]elivered to the individual using a means reasonably calculated to be received by the individual"; "[d]elivered sufficiently in advance of any termination to afford a reasonable opportunity to dispute the termination"; and "[i]ncluding notice of the right to seek an expedited appeal to the Human Services Board." *Id*. at 1-2.

On May 16, 2025, at the subsequent oral argument on the preliminary injunction motion, the parties stipulated to a preliminary injunction. The terms of the stipulated preliminary injunction are based in part on the Court's TRO. The Court extended that preliminary injunction several times to allow the parties to continue negotiating in an effort to agree on permanent relief. Apparently, agreement was elusive, and the parties then cross-moved for summary judgment.

Overview of General Assistance Emergency Housing Program

The State provides emergency housing benefits to individuals through the General Assistance Emergency Housing program. The State, through the Department, currently operates the program under a set of rules that were approved by the Legislative Committee on Administrative Rules in March 2025. Fourth Tousignant Decl. ¶ 5. Though the rules were not finalized by DCF, the 2026 Big Bill provides that the DCF Commissioner "shall apply" those rules. 2025, No. 27, § E.321(f).

To the extent that housing and funding are available, the Department "shall ensure" that emergency housing is provided "to households that attest to lack of a fixed, regular, and adequate nighttime residence" and have a member who falls into a particular category. *Id*. § E.321(a). Emergency housing "shall be provided in a community-based shelter whenever possible" but, if there is inadequate shelter space available, then "the household shall be provided emergency housing in a hotel or motel . . . , if available, until adequate community-based shelter space becomes available." *Id*. § E.321(b). "The Department shall, when available, prioritize emergency housing at housing or shelter placements other than hotels or motels." *Id*. § E.321(d).

The program contains statutory limitations. The 2026 Big Bill caps the total number of rooms available during the non-winter season at 1,100 per night and the number of non-winter season nights a household can use per 12-month period at 80 nights. 2025, No. 27,

2

§ E.321(b)(1), (2), (3).  The non-winter season runs "between July 1, 2025 through November 30, 2025 and between April 1, 2026 through June 30, 2026."  *Id*. § E.321(b)(1).  Additionally, all applicants and eligible households must "regularly provide information to the Department, not less frequently than monthly, about their efforts to secure an alternative housing placement."  *Id*. § E.321(b)(4)(A).  If not, then the Department "shall deny the application or terminate the authorization at the end of the current authorization period."  *Id*.

<u>Recent Changes to Emergency Housing Program</u>

On June 16, 2026, the Governor signed Act 143, which establishes a new "Vermont Homelessness Response Continuum," to "create an array of services that prevent and address homelessness in Vermont."  Act No. 143, § 4; 33 V.S.A. § 2202(a).  The new "continuum" aims to reduce reliance on hotels and motels for emergency housing, and places various new requirements and limits on both DCF and emergency housing participants.  *See generally* Act No. 143, § 4.

Act 143 also includes specific provisions regarding notice.  Under the new legislation, the Department "or a community partner shall provide written notice to any applicant or household whose participation in the Program is denied, reduced, suspended, or terminated."  33 V.S.A. § 2215(a).  Notice "shall include" the following:

> (1)  the specific factual and legal basis for the Office or community partner's decision;
> (2)  the effective date of the action, which in the case of termination, reduction, or suspension of services shall provide timely written notice by email or U.S. mail;
> (3)  a statement of the right to request a fair hearing pursuant to this section; and
> (4)  clear instructions, in plain language, on the process and deadlines for filing an appeal.

*Id*. § 2215(a).  Participants can request a fair hearing with the Human Services Board under certain specified circumstances, *id*. § 2215(b), and the Department or a community partner must continue to provide services "without interruption" throughout the appeal process except under particular situations, *id*. § 2215(d).

The Department must adopt rules to implement the new "continuum" and those rules must include, among other things, "a process for issuing timely, written approval or denial notifications to applicants" and "a process for issuing advance notice to households when the household is being terminated from the Program."  *Id*. § 2216(6)-(7).  The Act contemplates a transitional period for now, allowing the Department to develop the capacity to fully implement the new program in fiscal year 2028.  Act No. 143, § 7.  Between July 1, 2026 and August 31, 2026, the Department shall implement the new continuum "by applying the General Assistance Emergency Housing rules approved by the Legislative Committee on Administrative Rules on March 13, 2025."  Act No. 143, § 8(a)(2).  The Department "shall adopt and maintain emergency rules" by September 1, 2026, *id*. § 8(a)(1), and permanent rules by October 1, 2027, *id*. § 8(b)(1).

3

<u>Undisputed Material Facts</u>

The following material facts are undisputed for purposes of the cross motions. These material facts are all based on the emergency housing program as it has been implemented prior to the enactment of Act 143.

Typically, individuals apply for emergency housing by calling a DCF call center, and staff collect information bearing on the applicant's eligibility and make an eligibility determination. If an applicant is approved for hotel housing, the authorization is for a specified hotel and lasts for a discrete period of time. Defs.' Statement of Undisputed Material Facts ("Defs.' Facts") ¶ 3. DCF sometimes provisionally houses an applicant for several days while the applicant gathers documentation necessary to support eligibility. *Id*. ¶ 4. The length of an authorization period depends on several factors, including the preference, policy, and capacity of particular hotels. *Id*. ¶¶ 5-8. Emergency housing authorization periods do not exceed 28 days and are typically shorter than that. For example, between July 1, 2024 and May 8, 2025, the average length was 11 days, but most were 10 days or less. *Id*. ¶ 9. In order to remain in emergency housing past the authorization period, an individual must reapply to seek continued authorization. Pl.'s Statement of Undisputed Material Facts ("Pl.'s Facts") ¶ 4. If they do not reapply, their benefit terminates at the end of the authorization period with no additional notice. *Id*.

From the date this action was filed (March 15, 2024) until the date this Court issued the temporary restraining order (May 1, 2025), the State did not issue written notices of authorization to people granted emergency housing unless requested. Pl.'s Facts ¶ 1. In at least some instances, the State did not let individuals reapply for emergency housing until the end date of their authorizations. *Id*. ¶ 5. This resulted in some individuals losing housing the same day they called to reapply with no prior written notice. *Id*. ¶ 6.

On March 15, 2024, 347 households and 371 individuals were exited from their motel rooms after eligibility requirements changed, and just a few days later, 157 of those households and 172 individuals were subsequently determined to be eligible for emergency housing. Pls.' Facts ¶ 8. On March 14, 2024, one day before those terminations, the State had mailed a form letter to all households that it determined were not eligible under certain categories with instructions on how to apply under new eligibility criteria, but they were mailed too late to reach people before they had to check out of their emergency housing. *Id*. ¶ 9-10. The form letter did not explicitly state that the recipients' housing benefits would end. *Id*. ¶ 11.

The next year, on April 1, 2025, the State again exited hundreds of households from emergency housing, and many of those households became unsheltered as a result. *Id*. ¶ 14, 20. The State knew as early as March 10, 2025 that 445 households would not be eligible starting April 1. *Id*. ¶ 15. It sent non-individualized letters to emergency housing recipients on March 25 and 28 stating that winter eligibility was ending and that eligibility requirements for the program had changed again, but the letters did not explicitly state that the individual recipients' emergency housing would soon end. *Id*. ¶¶ 16-17. The letters stated that the recipients either would or would not be eligible depending on whether they already exceeded the 80-night annual cap, without providing specific information as to the individual recipients' emergency housing usage. Pls.' Ex. 32 and 33 for May 16, 2025 hearing (filed May 15, 2025).

Additionally, Plaintiff has provided evidence of some examples where individuals lost emergency housing benefits "without prior written notice," including C.T., G.F., S.M., J.H., S.B., and T.B. Pls.' Facts ¶¶ 21-26.[2] While living in emergency housing, many people do not know whether, when, or why their emergency housing will terminate. *Id.* ¶ 27. The State has found some participants to be eligible to remain in emergency housing after having exited them from housing without prior notice of the reason for the loss of housing. *Id.* ¶ 28.

The State has acknowledged that when it has mailed denial letters and other notices to emergency housing applicants and participants in the past, many were returned as undelivered, and that this has been a "barrier" in terms of getting information to clients. *Id.* ¶¶ 29-30. The rules governing emergency housing have been in a state of flux since 2022. *Id.* ¶ 32.

The State changed some practices in response to the Court's May 1, 2025 TRO. Five days after the TRO was issued, the State implemented a system to send written "notices of eligibility" to all participants as a matter of course (i.e., not only when it is requested as was the prior practice). Pls.' Facts ¶ 34. That practice has continued with the stipulated preliminary injunction, which remains in effect, but the State has not yet promulgated any rule requiring this practice to continue after the litigation ends. *Id.* ¶¶ 36-37.

While the State currently sends "notices of eligibility" as a matter of course, *see*, *e.g.*, Ex. 1 to Fifth Tousignant Decl. (filed Jan. 30, 2026), it still does not send separate "termination notices" when a participant is nearing the end of an authorization period. Pls.' Facts ¶¶ 40, 46. DCF has declined to provide an additional notice in advance of the end of a participant's authorization period, arguing that to do so would be duplicative and confusing. *Id.* ¶ 46. There is evidence that at least some emergency housing applicants and participants find the notices of eligibility confusing or misleading, and do not understand that this notice means they will soon lose their housing. *Id.* ¶¶ 41-42. On at least some occasions, emergency housing recipients have received notices of eligibility stating that their authorization for housing will end that day or the next day even though the State knew the ineligibility date weeks earlier, and some have not received written notice that their emergency housing will end until after their housing has already ended. *Id.* ¶¶ 44-45.

DCF's stated policy is to provide applicants who are denied housing a written denial notice, Defs.' Facts ¶ 20, but on some occasions, emergency housing applicants and recipients have not received denial notices that DCF claims to have sent when benefits are denied, Pls.' Facts ¶¶ 47-48. The State concedes that, on at least one occasion, it did not send a denial notice immediately upon the denial. *Id.* ¶ 49. Following the stipulated preliminary injunction, the State's current practice is to make best efforts to provide all notices by email when possible and to email such notices the same day they are issued. *Id.* ¶ 50. Also following the stipulated

---

[2] The State does not appear to dispute the basic facts of these situations, including that the individuals' emergency housing ended. However, the State disputes Plaintiffs' characterizations of how the housing benefit was terminated, and in some instances, whether the individual remained eligible for housing. *See* Defs.' Resp. to Pls.' Facts ¶¶ 21-26 (Feb. 10, 2026). As discussed below, these disputes are not material for purposes of deciding the motions.

5

preliminary injunction, the State now allows participants to reapply for additional housing up to 10 days before the end of the authorization period. Defs.' Facts ¶ 10.

In situations where the way someone's emergency housing benefits are provided changes prior to the end of an authorization period, DCF's stated policy is to provide the recipient a new notice of eligibility explaining the change and appeal rights. *Id*. ¶ 21. For example, if someone calls to reapply for a new authorization and a shelter bed has become available, DCF's policy is to update the authorization to reflect shelter housing and send a new notice of eligibility, reflecting the date of the change and indicating that the participant was sent to a shelter. *Id*. ¶ 22. Other examples include where a participant is asked by a hotel to leave for a policy violation that does not amount to "misconduct" under DCF's rules or where a participant leaves a placement voluntarily before the end of their authorization period. *Id*. ¶¶ 23-24. Plaintiffs dispute that there is any rule or "formal" policy to this effect, and that this is always the State's actual practice. Where an authorization is "terminat[ed]" for "misconduct," "DCF's policy is to send an updated 'Notice of Eligibility' reflecting the date the participant was removed from the hotel as the new end date." *Id*. ¶ 25.

On occasion, individuals contacting DCF about a notice with confusing information have been told something different than what is written in the notice of eligibility. Pls.' Facts ¶ 52. In at least one instance, DCF did not offer interpretation services to help a legally blind client understand the notices. *Id*. ¶ 53. On at least several occasions, people have received notices of eligibility with conflicting information. *Id*. ¶ 54.

Most households that contact DCF each day are already in emergency housing and reapplying for continued housing. DCF requires households to reapply for additional periods of emergency housing, in part, to allow it to track households and hotel rooms. *Id*. ¶ 57. The State tracks each participant's nights used toward the 80-day statutory limit, and it knows the authorization end dates for each participant because it sets those dates when issuing authorizations. *Id*. ¶¶ 58-59.

Applicants and participants who disagree with DCF decisions on emergency housing can appeal to the Human Services Board. Defs.' Facts ¶ 11. DCF has a procedure that first provides for internal review within two days to ensure the case has been processed correctly, though Plaintiffs dispute that this internal review procedure is always followed. *Id*. ¶ 12. If DCF does not reverse the decision internally, then it must send the appeal to the Board within three days, and it must abide by any expedited recommendation of the Board. *Id*. ¶¶ 13-14. During Human Services Board appeals, provisional housing pending the decision is not provided by default, but the applicant may request an order from the Board providing for such housing so long as housing is available. *Id*. ¶ 15.

Between June 15 and October 29, 2025, the Human Services Board received 401 appeals of adverse decisions in emergency housing, and of the 123 of those appeals decided by October 29, 2025, 84% were reversals of the State's decision. Pls.' Facts ¶¶ 70-71.

6

Discussion

I.       <u>Elements of Procedural Due Process Claim</u>.

In Count III, Plaintiffs allege that the State's administration of the GA Housing program violates Article IV of the Vermont Constitution, specifically its "[f]ailure to provide proper eligibility determinations or notice of decisions including denials or termination of benefits." Am. Compl. ¶¶ 107.[3]  Our Supreme Court "treat[s] Article 4 as the Vermont equivalent of the federal constitution's Due Process Clause." *Holton v. Dep't of Emp. & Training (Town of Vernon),* 2005 VT 42, ¶ 27, 178 Vt. 147 (citing *Quesnel v. Town of Middlebury,* 167 Vt. 252, 258, 706 A.2d 436, 439 (1997)).  A state cannot deprive a person of "life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.

"To adequately state a procedural due process claim, a plaintiff must allege facts showing that governmental action deprived plaintiff of a property or liberty interest protected by the Fourteenth Amendment to the United States Constitution." *Lowell v. Dep't for Child. & Fams.,* 2024 VT 46, ¶ 26, 219 Vt. 563 (quotation omitted), *cert. denied sub nom. Healey v. Vermont Dep't for Child. & Fams.*, 145 S. Ct. 1433 (2025).  When presented with a procedural due process claim, the court performs a two-part inquiry: "first[,] whether there exists a liberty interest which has been interfered with by the State; . . . second[,] . . . whether the procedures attendant upon that deprivation were constitutionally sufficient." *Id.* (quotation omitted).  "The core components of procedural due process are notice and an opportunity to be heard." *Id.* ¶ 27.  Nevertheless, procedural due process is a "flexible concept"; "[t]he formality and procedural requisites . . . can vary, depending upon the importance of the interests involved and the nature of the proceedings." *Id.* (quotation omitted).

A.       <u>Plaintiffs' Property Interest</u>

In ruling on the motion for judgment on the pleadings, this Court has already concluded that "the GA Housing program is sufficiently non-discretionary to create a protected property interest." 2025 WL 745679, at *5 (citing 33 V.S.A. § 2103(a) ("the Department for Children and Families shall furnish General Assistance . . . to any otherwise eligible individual"); FY 2025 Appropriations Act, § E.321(a) ("the Commissioner for Children and Families shall ensure that General Assistance Emergency Housing is provided")).  There is no genuine dispute that at least some individuals have been deprived of emergency housing benefits.  Accordingly, the question is whether the State's procedures related to such deprivation are constitutionally sufficient.

B.       <u>Adequacy of State's Procedures</u>.

As a general matter, Plaintiffs argue that the State failed to provide constitutionally adequate notice when this action was filed and that the State's current practices, which were

---

[3] Plaintiff also alleged that the State administered the program "without clear standards or rules or eligibility criteria." Am. Compl. ¶ 108.  However, this Court previously held that this aspect of the due process claim failed because it was "plainly an attack on rulemaking, or legislative, action."  2025 WL 745679, at *4.

7

implemented under court order and not memorialized in any "permanent rule or policy," remain constitutionally inadequate. Pl.'s Mot. at 3. The State maintains that its notice practices – both prior and present – exceed constitutional due process requirements. Defs.' Mot. at 10. However, oral argument helped to clarify the core, ongoing issue for the Court.

Specifically, Plaintiffs' primary contention is that the State still does not send separate "termination" notices before the conclusion of an authorization period or other occasions when housing benefits are "terminated," and that the failure to do so in all situations violates due process.[4] They argue that the "notices of eligibility" sent by the Department are inadequate to function as termination notices for multiple reasons: DCF often does not know whether someone will be able to remain in housing until they reapply; they are confusingly titled "notice[s] of eligibility"; people receive multiple "notice[s] of eligibility" during their time living in emergency housing; and the notices sometimes include conditional or contradictory statements about how long the person will be able to stay in emergency housing. Pls.' Reply at 7. Plaintiffs have provided their own proposed notices of eligibility and termination notices. *See* Pls.' Ex. 16 and 17, pp. 252 and 255 of PDF document (filed Dec. 5, 2025).

II.    <u>Constitutional Sufficiency of Notice Provided by DCF of Termination of Housing Benefits</u>.

In determining whether the Department's procedures are constitutionally adequate, the Court "applies the familiar three-part test set forth" in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *Lowell*, 2024 VT 46, ¶ 31. The Court must "balance (1) the private interest affected by the official action, (2) the risk of erroneous deprivation of that interest through the procedures used

---

[4] The Court notes that Plaintiffs' remaining claim sounds in the nature of a facial constitutional challenge to the Department's procedure that does not afford a second or subsequent termination notice. *See, e.g.*, *In re Mountain Top Inn & Resort*, 2020 VT 57, ¶ 22, 212 Vt. 554 (noting that in "a facial challenge, a litigant argues that no set of circumstances exists under which a statute or regulation could be valid" (quotation omitted)); *Luck Bros. v. Agency of Transp.*, 2014 VT 59, ¶ 18, 196 Vt. 584 (describing plaintiff's "facial challenge to the Agency's claims process," which asserted "that it is void and unenforceable because it was not formally promulgated by rule and does not provide the due process protections required by law"); *see also People v. Johnson*, No. 86, 2025 WL 3259873, at *7 (N.Y. Nov. 24, 2025) ("The party making a facial challenge must establish that a law is unconstitutional in every possible application. It is the 'most difficult challenge to mount successfully, because it requires a [party] to establish that no set of circumstances exists under which the [challenged law] would be valid.'" (quoting *United States v. Rahimi*, 602 U.S. 680, 693 (2024))), *cert. denied sub nom. Johnson v. New York*, No. 25-6940, 2026 WL 1780086 (U.S. June 22, 2026). Thus, Plaintiffs do not attempt to litigate the circumstances of any particular individual's termination and lack of notice, but rather seek a declaratory judgment and permanent injunction requiring the Department to adopt their proposed notice procedures in every case. *See In re Mountain Top Inn & Resort*, 2020 VT 57, ¶ 22 ("The distinction between facial and as-applied challenges goes to the breadth of the remedy. The remedy in a successful facial challenge is that a court will invalidate the contested law," as opposed to holding that the "statute or regulation is invalid as applied to the facts of a specific case." (quotation and citations omitted)).

and the probable value of additional procedures, and (3) the government's interest, 'including the function involved and the fiscal and administrative burdens that the additional or substitute requirement would entail.'" *Id*. (quoting *Mathews*, 424 U.S. at 334-35). Here, after careful consideration, the Court concludes that the Department's current practice, specifically as to the lack of a separate "termination" notice, is constitutionally sufficient to satisfy procedural due process standards.

### A. The Private Interest

As to the first factor, the Court noted previously that program participants have a protected liberty interest in emergency housing benefits, and this is a significant interest. Indeed, "[d]enials of public benefits . . . are determinations of a unique character and therefore entitled to increased constitutional protections." *Salisbury AD 1, LLC v. Town of Salisbury*, 2025 VT 43, ¶ 27, 346 A.3d 936 (citing *Goldberg v. Kelly*, 397 U.S. 254, 263-64 (1970)). Moreover, the "potential consequences to persons terminated from emergency" housing are indeed "grave." *Colon*, 462 F. Supp. 2d at 170.

### B. The Risk of Erroneous Deprivation

As for the second factor, however, the risk of erroneous deprivation through the failure to provide an additional "termination" notice is small because such notice would provide little to no additional value. The "notices of eligibility" that the Department currently provides to all participants display the first and last days of the authorization period and state, in bold:

> **Your current eligibility for Emergency Housing ends on** **_____ (check out date).**
>
> **Failure to reapply will result in the expiration of your authorization period and loss of housing.**

Fifth Tousignant Decl., Ex. 1. Thus, from the first day of their emergency housing authorization, participants are aware that their housing will expire on a certain date unless they reapply and the reason for the expiration (i.e., failure to reapply). As such, there is "no unfair surprise." *Salisbury AD 1, LLC*, 2025 VT 43, ¶ 27. The notice also informs participants when to reapply and how to appeal anything in the notice. Further, given the relatively short lengths of these authorizations (most stays were 10 days or less), Plaintiffs fail to establish the new information or added benefit that would derive from a second notice reminding participants that they will lose their housing if they do not reapply. In fact, such an additional notification may only increase confusion because, to be effective, the additional "termination" notices would have to be provided at the same time as or only a few days after the initial notice of eligibility. Such additional notice may very well make sense where government benefits are authorized for periods of months or years at a time, such as food stamps, Reach Up, childcare, or Medicaid, but that is not the case here.

Plaintiffs rely on *Colon v. Wagner*, 462 F. Supp. 2d 162, 169 (D. Mass. 2006), one of the few cases they cite that deal with emergency housing benefits rather than other types of benefits.

9

*See id.* at 172 (holding that prior notices or warnings did not adequately provide due process before termination of housing benefits for purposes of preliminary injunction). However, that case is readily distinguishable. First, *Colon* was in its preliminary stages; the decision addressed motions for a temporary restraining order and preliminary injunction, as well as class certification. In contrast, the present case is at a much later procedural stage. Moreover, *Colon* involved termination for specific conduct months earlier where the government failed to provide sufficient detail of that conduct on the notice. *Id.* at 169 ("it is unrealistic to expect homeless families to link the details of shelter warnings they may have received months earlier with boxes checked off on a[] [termination] form offering no specifics"). In this case, as noted above, the Court finds the eligibility notices currently used by the Department "provid[e] reasonably detailed description of the basis for the termination," as well as the end date and the consequence of failing to reapply. *See id.* at 172.

The Court recognizes the dissonance in how the parties are using the word "termination." The State points out that sometimes participants lose housing because of hotel policies or because shelter space becomes available, which does not necessarily mean that their *eligibility* is "terminated." Defs.' Reply at 12. Plaintiffs accuse the State of seeking to "avoid the requirements of due process by carefully avoiding the word 'termination' to describe a participant losing their emergency housing." Pls.' Reply at 8. They note that an "authorization period" is not a "constitutional shield," but is instead an "administrative convenience" created merely to manage DCF's relationships with hotels and motels. *Id.* Thus, Plaintiffs assert, the loss of one's emergency housing at the end of an authorization period is still the loss of a property interest which requires procedural due process. *Id.* Even accepting Plaintiffs' contention, however, the point is that the notice and process provided by the Department's policy are sufficient to satisfy constitutional safeguards.

C.      The Government's Interest

The third factor implicates the government's interest in effectively implementing the emergency housing program and the fiscal and administrative burden that the additional notice would entail. Plaintiffs contend that the administrative burden on the State in providing constitutionally adequate notice is small and does not outweigh the "grievous impact" of losing emergency housing. Pls.' Reply at 13. They assert that the relief they seek is narrow, feasible, and necessary. *Id.* at 18. Essentially, they argue that DCF can and should provide "termination" notices because it already has the information and systems needed to do so, and it already tracks all relevant data including each's person's total nights used toward the statutory cap, authorization end dates, and email address. *Id.* at 19. They suggest that the specific terms of injunctive relief here can "closely mirror" the terms of the Court's TRO issued last year. *Id.* at 19-20.

Despite Plaintiff's arguments, there is no question that providing an additional and often duplicative notice would increase the Department's administrative burden and expense to some extent. *See Colon*, 462 F. Supp. 2d at 173 (recognizing "the administrative and fiscal burdens that would ensue" if the court ordered plaintiffs' "proposed additional safeguards"). Moreover, as noted above, such a notice may actually create more confusion, which would further increase the Department's burden in attempting to alleviate such confusion. Consequently, in balancing

the three *Mathews* factors, the Court concludes that the Department's failure to send a separate "termination" notice in addition to the written notice of eligibility does not violate procedural due process.

### III. Further Considerations.

Certainly, there are things the Department could do to improve its notice practices and provide more clarity for program participants. For example, the distinction between "eligibility" and "authorization" is somewhat elusive, and titling its forms "notice of eligibility" when there is in fact a change in the type of benefit provided can be confusing. But Plaintiffs do not demonstrate that, considering the balance of the relevant interests, these practices rise to the level of a constitutional due process violation.[5]

In addition, Plaintiffs have identified several specific instances where individual participants were provided deficient notice in some fashion. The State frankly acknowledges that its administration of the program has not been perfect, and that there have been some instances where notice was not timely or properly provided to individuals. But again, Plaintiffs have not established any broad, systemic due process violations that would entitle them to the relief sought. *See In re Mountain Top Inn & Resort*, 2020 VT 57, ¶ 22. Nor have they shown that the appeal process is not adequate to address the concerns as to those individual participants. The 85% reversal rate of appeals cited by Plaintiffs shows that the appeal process is working as intended to afford review and correct errors in eligibility determinations where they occur.

Finally, with respect to the State's older notice practices that it has since modified, i.e., sending written notices of eligibility only upon request and not letting some participants reapply until the last day of their current authorization, Plaintiffs clarified at oral argument that they no longer seek a declaratory ruling as to those older practices. Accordingly, the Court need not reach the issue of whether such practices violated due process, although it seems likely that they would. To not provide any written notice whatsoever as to when emergency housing benefits are denied or will end creates an enormous risk of erroneous deprivation of participants' emergency housing benefits. *See generally Lowell*, 2024 VT 46, ¶ 31.

Further, to the extent Plaintiffs ask the Court to order the Department to continue its current practice of issuing *written* notices of eligibility, the Court finds there is no need to do so. The Department has committed to continuing this practice both in representations by counsel and in declarations from the Economic Benefits Director of its Economic Services Division. The Court concludes that the State has met its burden to establish that it cannot reasonably be expected to resume the challenged conduct, and thus the voluntary cessation doctrine does not apply. *See Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 243 (2024); *Vt. Journalism Tr. v.*

---

[5] As the Court previously acknowledged, there can be no dispute that Vermont's current homelessness crisis is a major problem that must be better addressed. *See, e.g.*, Entry re Mot. for Prelim Injunc., 2024 WL 1344378, at *9-10 (Mar. 22, 2024). Yet many of Plaintiffs' arguments regarding deficiencies with the program seem better addressed to the legislative and executive branches than the courts. Hopefully the enactment of Act 143 represents an initial step in achieving some positive progress towards this goal.

11

*Agency of Com. & Cmty. Dev.*, 2023 VT 30, ¶ 15, 218 Vt. 105; *Handy v. Fiske*, 2023 VT 46, ¶ 9 n.3, 218 Vt. 634 (mem.); *All Cycle, Inc. v. Chittenden Solid Waste Dist.*, 164 Vt. 428, 432-33, 670 A.2d 800, 803 (1995). Moreover, this issue may well be moot in any event come September 1, 2026, when Act 143 requires the Department to adopt emergency rules implementing the new statutory requirement to provide such written notice.

In sum, the undisputed facts demonstrate that the Department's procedure for sending eligibility notices stating the first and last dates of a participant's emergency housing authorization period, including the lack of a second or subsequent termination notice, does not violate procedural due process. Accordingly, Plaintiffs' motion for summary judgment is DENIED and Defendants' motion for summary judgment is GRANTED. *See Gates v. Mack Molding Co.*, 2022 VT 24, ¶ 13, 216 Vt. 379 ("Summary judgment will be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" (quoting V.R.C.P. 56(a))).

This decision resolves the core remaining issues raised by the parties in their summary judgment briefing, as clarified and narrowed at oral argument. Therefore, the Court intends to enter judgment and close the case. To the extent either party believes there are outstanding issues related to Plaintiffs' due process claim that require determination by the Court prior to the conclusion of this matter, they shall inform the Court within 14 days of the date of this Order by submitting a brief memorandum identifying the issue(s) and the relief sought, along with the proposals for next steps.

<u>Order</u>

For the foregoing reasons, the State's Motion for Summary Judgment (Mot. # 41) is GRANTED and Plaintiffs' Motion for Summary Judgment (Mot. # 43) is DENIED.

If either party believes there are outstanding issues related to Plaintiffs' due process claim that require determination by the Court prior to the conclusion of this matter, they shall inform the Court within 14 days of the date of this Order by submitting a brief memorandum identifying the issue(s) and the relief sought, along with the proposals for next steps. Otherwise, the Court will enter judgment and close the case.

The stipulated preliminary injunction shall remain in effect until the case is closed.

Electronically signed on July 30, 2026 at 11:54 AM pursuant to V.R.E.F. 9(d).

Megan J. Shafritz
Superior Court Judge

12